# United States District Court

### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| SPEND LIFE WISELEY COMPANY, F/K/A DURANT BANCORP, INC. and FIRST UNITED BANK AND TRUST COMPANY, | § § § § § | Civil Action No. 4:22-cv-00509 Judge Mazzant |
| *Plaintiffs,* | § § | |
| v. | § § | |
| STEPHEN D. PHILLIPS, | § § | |
| *Defendant.* | § § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Pending before the Court is Plaintiffs' Motion for Summary Judgment Against Defendant's Counterclaims (Dkt. #18), Plaintiffs' Motion for Summary Judgment on Each of Its Claims Against Defendant (Dkt. #20), Defendant's Cross Motion for Summary Judgment (Dkt. #23), and Plaintiffs' Amended Motion to Strike Defendant's Cross Motion for Summary Judgment (Dkt. #28). Having considered the motions and the relevant pleadings, the Court finds that (1) Plaintiffs' Motion for Summary Judgment Against Defendant's Counterclaims (Dkt. #18) should be **GRANTED in part**; (2) Plaintiffs' Motion for Summary Judgment on Each of Its Claims Against Defendant (Dkt. #20) should be **GRANTED in part**; (3) Defendant's Cross Motion for Summary Judgment (#23) should be **DENIED**; and (4) Plaintiffs' Amended Motion to Strike Defendant's Cross Motion for Summary Judgment (Dkt. #28) should be **GRANTED**.

# BACKGROUND

## I.    Factual History

This suit arises in the context of an alleged violation of a non-compete agreement. First United Bank and Trust Company ("First United") is a bank with regional operations in Texas and Oklahoma (Dkt. #20, Exhibit #1 ¶ 3). First United's locations span from Central and Northern Texas to Central and Eastern Oklahoma (Dkt. #20, Exhibit 3). First United offers products and services "including, but not limited to, savings and checking accounts, certificates of deposit, mortgages, home equity loans and lines of credit, auto and agriculture loans, SBA lending and builder finance and commercial loans" (Dkt. #20, Exhibit 1 at ¶ 4). Toni Preston, a Senior Vice President at First United, claims that "[a] majority of First United's customers live or operate their businesses within 100 miles of First United's locations" (Dkt. #20, Exhibit 1 at ¶ 5).

Stephen D. Phillips previously served as the President of First United (Dkt. #23, Exhibit 1 ¶ 2). On July 1, 2017, Phillips and First United signed a Stock Purchase Agreement and related documents, where First United agreed to lend $4,000,000 to Phillips to purchase shares in First United (Dkt. #23, Exhibit 1 ¶ 4). As a condition of the stock purchase, Phillips signed a Restrictive Covenant Agreement (the "Agreement") (Dkt. #23, Exhibit 1 ¶ 4).

The Agreement contains the following restrictions on competition:

(a) During the Non-Competition Period (as defined in Section 2(b) below), the *Undersigned agrees not to* (either personally or by or through his agent), *directly or indirectly, with or without compensation, engage in, be employed by or have any interest in* (whether as a shareholder, director, officer, employee, subcontractor, partner, consultant, proprietor, agent or otherwise) *any Prohibited Business* (as defined below) *having an office located, or any employees principally doing business, within 100 miles of any office of the Bank* including, without limitation, any office of the mortgage division of the Bank; provided that the foregoing shall not (i) prevent or otherwise restrict the Undersigned from owning, directly or indirectly, in the aggregate, not more than 2% of any class of securities of any competitor of the Bank or its Affiliates

solely as a passive investment so long as such securities are listed for trading on NASDAQ in the over-the-counter market or are traded on a national securities exchange, or (ii) require the Undersigned to divest his ownership in any Prohibited Business to the extent that such ownership exists as of the date of this Agreement. For the purposes hereof, (x) *the term "Prohibited Business" shall mean any company or other entity engaged in business of originating mortgage loans as well as the purchase and sale of mortgage loans through the secondary mortgage market, including an Affiliate thereof, or any federally insured depository institution, including an Affiliate thereof*; and (ii) *the term "Affiliate" shall mean any individual, corporation, partnership, limited liability company or other entity (each, a "Person") that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with a referenced Person.*

(b) *The term "Non-Competition Period" shall mean the period commencing on the date of this Agreement and ending on the earlier of*: (i) the first anniversary date following the Undersigned's Separation Date, in the event the Separation Date occurs within twelve (12) months following the date of this Agreement; (ii) the second anniversary date following the Undersigned's Separation Date, in the event the Separation Date occurs after twelve (12) months, and prior to twenty four (24) months following the date of this Agreement*; (iii) the third anniversary following the Undersigned's Separation Date, in the event the Separation Date occurs at any time following twenty four (24) months after the date of this Agreement; (iv) thirty (30) days following the date on which the Undersigned is no longer serving as an executive officer of the Company or the Bank, and remains employed by the Company or the Bank;* or (v) one (1) day following the date on which a Massey Person, a Massey Permitted Transferee, the ESOP and any other Company sponsored employee benefit plan do not, collectively, own directly or indirectly, not less than 50.1% of the outstanding voting common stock of the Company. For the purposes hereof the terms "Massey Person," "Massey Permitted Transferee" and "ESOP" shall have the meanings given in the Company's Amended and Restated Shareholders Agreement dated as of November 9, 2016.

(Dkt. #21, Exhibit 2) (emphasis added). Phillips's position as President of First United ended on

April 30, 2021 (Dkt. #20, Exhibit 1 ¶ 10). On the same day, Phillips and First United entered into

a Severance Agreement, where he would continue to receive his base salary of $496,100.16 for one

year (Dkt. #20, Exhibit 1 ¶ 10). According to the Severance Agreement:

[Phillips's] employment with [First United] will become inactive effective April 30, 2021 (the "Inactive Date"). As of the Inactive Date, [Phillips] shall be reclassified as a non-officer employee of [First United], and [Phillips] shall resign from the

board of directors of [First United]. [Phillips's] employment with [First United] will cease on April 30, 2022 (the "Date of Termination").

(Dkt. #21, Exhibit 4 at p. 2). The parties fiercely contest whether Phillips remained an employee of First United after April 30, 2021 (until April 30, 2022) (*See* Dkt. #20 at pp. 16–22; *see also* Dkt. #23 at pp. 17–20). First United claims Phillips's redesignation as non-officer employee served to "administer his severance payment and related benefits through First United's payroll system from April 30, 2021 through April 30, 2022" (Dkt. #20, Exhibit 1 at ¶ 11).

Phillips has admitted to various matters relating to his relationship with First United after April 30, 2021. First, Phillips admitted that "[he] did not perform any work on behalf of First United after April 30, 2021" (Dkt. #20, Exhibit 4 at p. 3). Second, Phillips admitted that "[he] did not provide any services on behalf of First United after April 30, 2021" (Dkt. #20, Exhibit 4 at p. 3). Third, Phillips admitted that "[he] did not have access to [his] First United email account after April 30, 2021" (Dkt. #20, Exhibit 4 at p. 3). Fourth, Phillips admitted that "[he] did not have access to First United's computer systems after April 30, 2021" (Dkt. #20, Exhibit 4 at p. 3). Fifth, Phillips admitted that "[he] could no longer enter First United's offices and branch locations before or after normal business hours after April 30, 2021" (Dkt. #20, Exhibit 4 at p. 3). Finally, Phillips admitted that "[he] returned all property belonging to First United on or before April 30, 2021" (Dkt. #20, Exhibit 4 at p. 3).

However, Phillips claims that "[he] remained available during the severance period [(April 30, 2021, to April 30, 2022)] to perform work for First United" (Dkt. #23, Exhibit 1 ¶ 7). Further, Phillips claims that from April 30, 2021, to April 30, 2022, at the request of numerous First United employees, "[he] had numerous calls and in-person meetings with First United Executives, including Regional Market Presidents, Market Presidents, Senior Vice Presidents of Operations,

and other Bank Officers asking for information and guidance on how to handle matters at First United" (Dkt. #23, Exhibit 1 ¶ 7). After April 30, 2021, "[Phillips] no longer performed any of his former job duties for First United; he was removed from First United's executive leadership team and Board of Directors" (Dkt. #20, Exhibit 1 ¶ 14).

Following Phillips redesignation or alleged termination (on April 30, 2021), First United exercised its option to purchase First United stock that Phillips owned (Dkt. #21, Exhibit 3 at p. 4). This purchase resulted in Phillips receiving a net gain of $3,131,817.32 from the sale of his stock in First United (Dkt. #3 at p. 6). First Bank had retained a purchase option allowing First Bank to purchase its shares from any shareholder who no longer had a "Qualified Position" (Dkt. #21, Exhibit 3 at p. 4). A "Qualified Position" is either an officer or director of First United or any Durant Bancorp Subsidiary (Dkt. #21, Exhibit 3 at p. 4). Neither party asserts that Phillips possessed a "Qualified Position" (regardless of whether he was otherwise an employee of First United at the time) when First United exercised its purchase option.

First United claims that Phillips's current employment situation with United Texas Bank ("UTB") violates his promise not to compete with First United in the Agreement (Dkt. #1 ¶¶ 24–34). On May 2, 2022, Phillips began working for UTB as its President. "UTB is a boutique commercial bank, primarily servicing business customers, with approximately $1 billion in assets under management" (Dkt. #23, Exhibit 1 ¶ 8). UTB has two locations and about 60 employees (Dkt. #23, Exhibit 1 ¶ 8). Phillips has admitted that "[his] current work location for United Texas Bank is located within 100 miles of one or more First United locations" (Dkt. #20, Exhibit 4 at p. 3).

The parties disagree on whether UTB is a competitor to First United. First United claims that UTB "is a direct competitor of First United" (Dkt. #20, Exhibit 1 ¶ 16). In contrast, Phillips claims that "UTB and First United are not competitors, because the banks generally service very different customer bases" (Dkt. #23, Exhibit 1 ¶ 9). Further, Phillips states that "[t]he business strategies and customer information that [he] had access to as President of First United are wholly irrelevant to [his] work at UTB, which services a radically different market" (Dkt. #23, Exhibit 1 ¶ 9).

On June 7, 2022, First United sent a letter to UTB regarding its employment of Phillips. This letter stated, in part:

> The specific reason for this correspondence is to notify you that during his employment with First United, Mr. Phillips executed a Restrictive Covenant Agreement ("the Agreement" which restricts his post-employment conduct to protect First United's confidential and proprietary business information and the business relationships the Bank has with its customers . . . Unfortunately, First United recently learned that Mr. Phillips went to work for United Texas Bank in violation of his obligation not to gain employment with a competitor within 100 miles of a First United location. First United is also concerned that through his employment with you, Mr. Phillips has or will disclose the Bank's confidential and proprietary information for his own benefit as well as United Texas Bank's benefit in violation of the Agreement. Finally, First United is concerned that Mr. Phillips intends to solicit employees and/or customers of the Bank in violation of the Agreement. As you might imagine, Mr. Phillips current and future violations of the Agreement are of great interest and alarm to First United.

(Dkt. #18, Exhibit 3 at pp. 4–5).[1]

---

[1] Although Phillips describes this letter as a "demand letter," the Court would not use that description (See Dkt. #3 at p. 11). First United does not specifically demand anything in the letter, but the letter instead serves to notify UTB of Phillips's alleged contractual violations (See Dkt. #18, Exhibit 3 at p. 4).

## II.    Procedural History

First United and Spend Life Wisely Company, Inc. ("Spend Life") brought suit against Phillips for breach of contract and for a declaratory judgment regarding the Agreement (Dkt. #1 ¶¶ 24–34). First United and Spend Life's position is that Phillips was no longer an employee of First United after April 30, 2021, making the non-compete provision of the Agreement last for 3 years (Dkt. #1 ¶ 19). Therefore, First United and Spend Life claim that Phillips's current role at UTB violates the Agreement (Dkt. #1 ¶¶ 17, 20).

Phillips timely filed his answer (Dkt. #3). In his answer, Phillips denied Plaintiffs' claims and asserted counterclaims of breach of contract, and defamation and libel against First United (Dkt. #3 at pp. 12–13). Phillips's position is that he was a (non-officer) employee between April 30, 2021, and April 30, 2022, making the non-compete provision of the Agreement (if it is enforceable at all) only last for 30 days until May 30, 2021 (Dkt. #3 at p. 5). Therefore, Phillips claims that his current role at UTB does not violate the Agreement (Dkt. #3 at p. 11). First United and Spend Life timely filed an answer denying Phillips's counterclaims (Dkt. #7).

The Court's Scheduling Order established the party's deadline to file dispositive motions as April 13, 2023 (Dkt. #12 at p. 2). First Bank and Spend Life timely filed two motions for summary judgment, one regarding their claims against Phillips and another regarding Phillips's counterclaims (Dkt. #18; Dkt. #20). Phillips's deadline to respond to First Bank and Spend Life's motions for summary judgment was May 4, 2023. *See* LOC. R. CV-7(e). On May 4, 2023, Phillips filed a motion for summary judgment dealing with First Bank and Spend Life's claims against Phillips and a response to Plaintiffs' motion for summary judgment on the same claims, both in the same document (Dkt. 23). Phillips did not file a response to Plaintiffs' other motion for summary

7

judgment. First United and Spend Life timely filed a reply/response (Dkt. #26). Then, First Bank and Spend Life filed a motion to strike Phillip's motion for summary judgment because it was untimely filed (Dkt. #28). Phillips timely filed a response to the motion to strike (Dkt. #29).

**LEGAL STANDARD**

## I.  Motion to Strike

"[A] district court should not be obliged to interrupt the orderly proceedings of its docket to rule on [an] issue when [a party] could have easily presented these matters earlier." *Teal v. Eagle Fleet, Inc.*, 933 F.2d 341, 346 (5th Cir. 1991). Rule 16 states that a scheduling order may only be modified for "good cause" and with the judge's consent. FED. R. CIV. P. 16(b)(4); *S & W Enters. v. SouthTrust Bank*, 315 F.3d 533, 536 (5th Cir. 2003). Also, Rule 6 states that if a request is made to extend time after the original time has already expired, the court may "for good cause, extend the time . . . if the party failed to act because of excusable neglect." FED. R. CIV. P. 6(b)(1)(B). Relevant factors used to determine "excusable neglect" include: (1) the danger of prejudice to the non-movant; (2) the length of the delay and its potential impact on judicial proceedings; (3) the reason for the delay, including whether it was within the movant's reasonable control; and (4) whether the movant acted in good faith. *Rivero v. Sunbeam Products, Inc.*, No. SA-08-CV591-XR, 2010 WL 1752532, at *1 (W.D. Tex. Apr. 29, 2010). (citing *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993); *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 161 n.8 (5th Cir. 2006)). To establish "good cause" a party must show that it "could not have met the deadline despite its diligence" along with satisfaction of the four-part test. *S & W Enters.*, 315 F.3d at 536–38.

## II.     Motion for Summary Judgment

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Summary judgment is proper under Rule 56(a) of the Federal Rules of Civil Procedure "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute about a material fact is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). Substantive law identifies which facts are material. *Id.* The trial court "must resolve all reasonable doubts in favor of the party opposing the motion for summary judgment." *Casey Enters., Inc. v. Am. Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir. 1981).

The party seeking summary judgment bears the initial burden of informing the court of its motion and identifying "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" that demonstrate the absence of a genuine issue of material fact. FED. R. CIV. P. 56(c)(1)(A); *Celotex*, 477 U.S. at 323. If the movant bears the burden of proof on a claim or defense for which it is moving for summary judgment, it must come forward with evidence that establishes "beyond peradventure *all* of the essential elements of the claim or defense." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). Where the nonmovant bears the burden of proof, the movant may discharge the burden by showing that there is an absence of evidence to support the nonmovant's case. *Celotex*, 477 U.S. at 325; *Byers v. Dall. Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000). Once the movant has carried its burden, the nonmovant must "respond to the motion for summary judgment by setting forth particular facts indicating

there is a genuine issue for trial." *Byers*, 209 F.3d at 424 (citing *Anderson*, 477 U.S. at 248–49). A nonmovant must present affirmative evidence to defeat a properly supported motion for summary judgment. *Anderson*, 477 U.S. at 257. Mere denials of material facts, unsworn allegations, or arguments and assertions in briefs or legal memoranda will not suffice to carry this burden. Rather, the Court requires "significant probative evidence" from the nonmovant to dismiss a request for summary judgment. *In re Mun. Bond Reporting Antitrust Litig.*, 672 F.2d 436, 440 (5th Cir. 1982) (quoting *Ferguson v. Nat'l Broad. Co.*, 584 F.2d 111, 114 (5th Cir. 1978)). The Court must consider all of the evidence but "refrain from making any credibility determinations or weighing the evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).

## ANALYSIS

One of, if not, the most important factual issues remaining in this case is whether Phillips remained an employee of First United after April 30, 2021. If he did not remain an employee of First United, then the non-compete provision of the Agreement lasts for 3 years. In this scenario, Phillips's current role at UTB would most likely violate the Agreement. However, if Phillips did remain an employee of First United between April 30, 2021, and April 30, 2022, then the non-compete provision of the Agreement only lasted for 30 days, until May 30, 2021 (Dkt. #3 at p. 5). In this scenario, Phillips's current role at UTB would not violate the agreement.

### I.     First United and Spend Life's Motion to Strike

Plaintiffs argue that the Court should strike Phillips's motion for summary judgment because he untimely filed his motion without seeking leave of court to file his motion or receiving agreement from Plaintiffs to extend the dispositive motions deadline (Dkt. #28 at p. 3). In response, Phillips argues that the Court should consider his motion because (1) the Court has broad

discretion to consider untimely filed motions, (2) the consideration of dispositive motions furthers the interest of judicial economy, and (3) consideration of Phillips's untimely motion would not prejudice Plaintiffs (Dkt. #29 at pp. 2–3).

Multiple reasons exist for the Court to grant Plaintiffs' motion to strike. As a threshold matter, Defendant's Cross Motion for Summary Judgment (Dkt. #23) was untimely filed. The deadline for dispositive motions was April 13, 2023, but Phillips did not file the motion until May 4, 2023 (Dkt. #12 at p. 2; Dkt. #23). First, Phillips did not file a motion to extend his time to file a motion for summary judgment as required under Rule 6. *See* FED. R. CIV. P. 6(b)(1)(B). Second, Phillips has not given any indication that he could not have met the deadline despite his diligence. *See S & W Enters.*, 315 F.3d at 536–38. Third, even assuming that considering Phillips's untimely motion for summary judgment would not prejudice Plaintiffs, Phillips has not made any showing regarding the other three factors. *See Rivero*, 2010 WL 1752532, at *1.

For the reasons discussed above, the Court grants Plaintiffs' Amended Motion to Strike Defendant's Cross Motion for Summary Judgment (Dkt. #28).

## II.     First United and Spend Life's Motion for Summary Judgment on Phillips's Counterclaims

Plaintiffs' Motion for Summary Judgment Against Defendant's Counterclaims (Dkt. #18) addresses two issues: (1) Phillips's breach of contract counterclaim; and (2) Phillips's defamation and libel claim. The Court grants Plaintiffs' motion as to Phillips's breach of contract counterclaim and a portion of his defamation and libel claim.

"[W]hen the nonmoving party has failed 'to address or respond to a fact raised by the moving party and supported by evidence,' then the fact is undisputed." *Div. 80 LLC v. Garland*, No. 3:22-cv-148, 2023 WL 3956191, at *1 (S.D. Tex. June 12, 2023) (quoting *Broad. Music, Inc. v.*

*Bentley*, No. SA-16-CV-394-XR, 2017 WL 782932, at *2 (W.D. Tex. Feb. 28, 2017)). "'Such undisputed facts may form the basis for summary judgment.'" *Id.* (quoting *Broad Music, Inc.*, 2017 WL 782932, at *2)).

### A.  Breach of Contract

The basis of Phillips's breach of contract claim is that "First United has breached the terms of the [Agreement] by filing this lawsuit against Phillips alleging that the [Agreement] did not terminate on May 30, 2021" (Dkt. #3 at p. 12). Phillips's does not identify a specific provision that First United allegedly breached (Dkt. #3).

First United and Spend Life present two main arguments regarding Phillips's breach of contract counterclaim. First, Plaintiffs claim that they did not breach the contract by filing this lawsuit because the Agreement expressly states that it does not prohibit First United from pursuing legal remedies for a breach of the Agreement (Dkt. #18 at pp. 8–9). Plaintiffs further argue that the Agreement does not contain any term that prohibits Plaintiffs from filing suit to enforce the terms of the Agreement (Dkt. #18 at p. 8). Second, Plaintiffs argue that Phillips did not sustain any damages due to any alleged breach by Plaintiffs (Dkt. #18 at pp. 9–10). The Court does not reach Plaintiffs' second argument because their first argument is dispositive.

Phillips has offered no evidence demonstrating that First United breached the Agreement. Phillips's breach of contract claim requires that "[First United] breached the contract by failing to perform or tender performance as the contract required." *USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 502 n.21 (Tex. 2018). Phillips has not provided any basis for his claim that First United breached the Agreement other than by filing this lawsuit (*See* Dkt. #3). The Agreement does not contain any provision prohibiting First United from filing suit. Rather, the Agreement considers

that First United may seek remedies for a breach of the agreement: "Nothing contained in this Agreement shall be construed as prohibiting the Company from pursuing or limiting the Company's ability to pursue, any other remedies available for any breach or threatened breach of this Agreement by the Undersigned" (Dkt. #19, Exhibit 2 at p. 4).

Plaintiffs have met their burden by demonstrating that Phillips has provided no evidence that First United breached the Agreement. Thus, Plaintiffs have conclusively negated Phillips's breach of contract claim by showing that no genuine issue of material fact exists. Therefore, the Court grants summary judgment in favor of Plaintiffs regarding Phillips's breach of contract claim.

### B.  Defamation and Libel

Phillips's defamation and libel claim against First United revolves around the June 7, 2022 letter that First United sent to UTB (Dkt. #3 at pp. 11–12). Phillips claims that this letter is "a publication of statements of facts that are false and disparage the character of Phillips" (Dkt. #3 at p. 11). He further argues that "this written statement was intentionally made by First United to put Phillips in a false light with United Texas Bank" (Dkt. #3 at p. 11).

Plaintiffs assert that Phillips's claim must fail for multiple reasons. As an initial matter, Plaintiffs treat only the first three sentences of the third paragraph in the letter as potentially defamatory because Plaintiffs claim that only these sentences relate to Phillips's performance under the Agreement (*See* Dkt. #18 at pp. 10–11; Dkt. #18, Exhibit 3 at p. 5). First, Plaintiffs argue that one statement in the letter is not actionable because it is a statement of truth (Dkt. #18 at pp. 10–11). Second, Plaintiffs claim that some of the statements in the letter are not actionable because they are mere opinions (Dkt. #18 at pp. 11–12). Third, Plaintiffs argue that the judicial proceedings privilege protects the statements within the letter (Dkt. #18 at pp 12–13).

1.    **Statement of Truth**

Regarding the first sentence of the third paragraph in the June 7, 2022 letter stating that Phillips violated his obligations under the Agreement by accepting employment within 100 miles of a First United location, Plaintiffs claim this statement is a true statement of Plaintiffs' legal position (Dkt. #18 at p. 11). Plaintiffs further claim that this statement is not actionable because it is not a statement of fact that is verifiably false (Dkt. #18 at p. 11).

The statement at issue does not constitute Plaintiffs' legal position. Plaintiffs do not provide an example of a statement that is a party's "legal position," as opposed to a factual allegation. First United stated in the letter that it "recently learned that Mr. Phillips went to work for United Texas Bank in violation of his obligation not to gain employment with a competitor within 100 miles of a First United location" (Dkt. #18, Exhibit 3 at p. 5). First United did not couch the statement in language suggesting that it was solely First United's legal position (*See* Dkt. #18, Exhibit 3 at p. 5). Rather, First United presented the statement in an objective manner, that Phillips had violated his obligation under the Agreement (*See* Dkt. #18, Exhibit 3 at p. 5).

At this stage of the case, the Court cannot determine that the statement at issue is a true statement. "Truth is a complete defense to defamation." *Randall's Food Mkts, Inc. v. Johnson*, 891 S.W.2d 640, 646 (Tex. 1995). The Court cannot determine whether the statement at issue is a true statement because the issue of whether Phillips breached the Agreement is still an active issue in this case. *See infra* Part III.A.

Similarly, the Court cannot determine whether the statement at issue is verifiably false. "If a statement is not verifiable as false, it is not defamatory." *Dallas Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 624 (Tex. 2018). The Court cannot determine whether the statement at issue is

verifiably false because a genuine issue of material fact exists regarding whether Phillips breached the Agreement. *See infra* Part III.A.

   2.    **Statements of Opinion**

Plaintiffs assert that the remaining statements about Phillips in the June 7th, 2022 letter constitute First United's opinions and cannot support a defamation claim (Dkt. #18 at p. 11). These statements consist of two sentences in the third paragraph of the June 7th, 2022 letter where First United states that it is "concerned" that Phillips may take certain actions that would violate the agreement (Dkt. #18, Exhibit 3 at p. 5). Plaintiffs argue that the subjective language in these statements demonstrates that they are opinions, as opposed to statements of fact (Dkt. #18 at pp. 11–12).

Statements that use subjective language and convey information through a personal viewpoint (such as "I think," "I understand," and "so I guess") may constitute opinions. *Dallas Morning News, Inc.*, 554 S.W.3d at 639. Opinions, which include statements that cannot be verified or understood to convey a verifiable fact, are not actionable. *Id.* "Whether a statement is an opinion is a question of law." *Id.* In *Dallas Morning News, Inc. v. Tatum*, the Supreme Court of Texas found that a newspaper column constituted an opinion, in part based on its usage of subjective language. *Id.* The Supreme Court of Texas noted that "[t]he first sentence begins with 'So I guess,' the column uses various versions of 'I think' and 'I understand,' and near the column's close [the author] states 'the last thing I want to do is put guilt on the family of suicide victims.'" *Id.* "This first-person, informal style indicates that the format is subjective rather than objective." *Id.* Along with other factors, such as how the column did not include any undisclosed facts, the court found that the entire newspaper column constituted an opinion. *Id.*

Similar to the newspaper column in *Dallas Morning News, Inc.*, the two statements at issue in the June 7, 2022 letter constitute opinions. "Concern" means "to be a care, trouble, or distress to." *Concern*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/concern (last visited Oct. 16, 2023). Akin to terms such as "So I guess," "I think," and "I understand," the word "concern" is subjective language. Further, First United's usage of the term "concerned" involves the conveyance of information from a personal viewpoint.

Plaintiffs have met their burden regarding the two statements at issue by demonstrating that the statements are opinions. Thus, Plaintiffs have conclusively negated Phillips's defamation and libel claim for the two statements at issue by showing that no genuine issue of material fact exists. Therefore, the Court grants summary judgment in favor of Plaintiffs on Phillips's defamation and libel claim only regarding these two statements.

### 3.   Judicial Proceedings Privilege

Finally, Plaintiffs argue that all statements within the June 7, 2022 letter are absolutely protected under the judicial proceedings privilege because "[t]he privilege broadly protects communications prior to commencement of the judicial proceeding when those communications have 'some relation to the proceeding that is actually contemplated in good faith and under serious consideration by the witness or a possible party to the proceeding'" (Dkt. #18 at p. 13).

Under the judicial proceedings privilege, "[c]ommunications in the due course of a judicial proceeding will not serve as the basis of a civil action for libel or slander, regardless of the negligence or malice with which they are made." *James v. Brown*, 637 S.W.2d 914, 916 (Tex. 1982). The privilege provides an absolute protection for "'[c]ommunications in the due course of a judicial proceeding' or in 'serious contemplation' of such a proceeding from defamation claims."

16

*Cantey Hanger, LLP v. Byrd*, 467 S.W.3d 477, 487 n.12 (Tex. 2015) (quoting *Shell Oil Co. v. Writt*, 464 S.W.3d 650, 655 (Tex.2015)).

The Supreme Court of Texas recently clarified where the judicial proceedings privilege applies in *Landry's Inc. v. Animal Legal Defense Fund*. 631 S.W.3d 40 (Tex. 2021). In *Landry's Inc.*, the defendants had sent a notice letter to various persons prior to beginning litigation as required under the Endangered Species Act. *Id.* at 44. However, the defendants also sent the notice letter to the media and made a press release online relating to the notice letter. *Id.* at 44–45. The plaintiff then sued the defendants for defamation based on the release of the newsletter to the media and public. *Id.* at 45. The defendants claimed that the judicial proceedings privilege protected the contents of the notice letter and press release. *Id.* The Supreme Court of Texas clarified that it is not sufficient that the statement's subject matter bears a relation to the proceeding. *Id.* at 49. Rather, "the statement *itself* must bear 'some relation to a proceeding.'" *Id.* The court explained that "[t]he judicial-proceedings privilege deals specifically with statements connected to litigation." *Id.* at 53. "Within that realm, the judicial-proceedings privilege distinguishes between statements within the litigation and statements outside of it. The former are generally privileged, while the latter generally are not." *Id.* The court determined that the privilege did not protect the online press release and sharing of the notice letter to the media because they defendants repeated the contents of the notice letter for publicity purposes "'outside the protected context within which the statements originally were made.'" *Id.* at 50.

The judicial proceedings privilege does not protect the statements within the June 7, 2022 letter. The letter occurred outside of this litigation and did not demand anything from UTB (*See* Dkt. #18, Exhibit 3 at pp. 4–5). Although the letter may have played an important function to First

United, "[it is] in no way part of a judicial proceeding or preparatory to one in any formal sense." *See Landry's Inc.*, 631 S.W.3d at 49. Akin to the media release in *Landry's Inc.*, the letter's subject matter may bear a relation to this proceeding, but the statements within the letter itself do not bear a relation to this proceeding. *See id.*

Plaintiffs have not met their burden to demonstrate that the judicial proceedings privilege applies to the statements within the June 7, 2022 letter. A genuine issue of material fact still exists regarding the first sentence of the third paragraph in the June 7, 2022 letter. Therefore, the Court does not grant summary judgment regarding the first sentence of the third paragraph of the June 7, 2022 letter.

## III. First United and Spend Life's Motion for Summary Judgment on Their Claims

Plaintiffs' Motion for Summary Judgment on Each of Its Claims Against Defendant (Dkt. #20) addresses three issues: (1) Phillips's employment status; (2) the validity of the Agreement; and (3) Plaintiffs' damages for their claims.[2] The Court grants Plaintiffs' motion only to the extent the Agreement constitutes a valid contract. The Court does not make any finding as to the temporal extent of Phillips's obligations under the non-compete provision because that issue depends on the outcome of a genuine issue of material fact.

---

[2] Plaintiffs state that their motion addresses the following six issues:

> (1) the term of the "Non-Competition Period", as defined in the Restrictive Covenant Agreement, has not expired; (2) the "Non-Competition" provision in the Restrictive Covenant Agreement remains in full force and effect for a period of three (3) years following Phillips' termination from his employment with First United on April 30, 2021; (3) Phillips breached the Restrictive Covenant Agreement; (4) Phillips is enjoined from continuing his employment with UTB or any other competitor within 100 miles of a First United location until April 30, 2024; (5) First United be awarded $3,627,917.48 for damages suffered as a result of Phillips' conduct; and (6) First United be awarded its attorneys' fees and costs incurred in the prosecution and defense of this case pursuant to Tex. Civ. Prac. & Rem. Code 38.001.

(Dkt. #20 at p. 5). However, Plaintiffs organized their motion along the three previously listed topics (Dkt. #20 at p. 2). The Court will address Plaintiff's motion based on the three previously listed topics.

### A.  Phillips's Employment Status

After a careful review of the record and arguments presented, the Court is not convinced that Plaintiffs met their burden of demonstrating that no genuine issue of material fact exists as to whether Phillips remained an employee of First United after April 30, 2021, such that Plaintiffs would be entitled to judgment as a matter of law. Accordingly, the Court finds that Plaintiffs' Motion for Summary Judgment on Each of Its Claims Against Defendant (Dkt. #20) should be denied as to whether Phillips breached the contract by failing to perform or tender performance as the contract required.

### B.  Validity of the Agreement

Plaintiffs argue that the Agreement is enforceable because it is ancillary to an otherwise enforceable agreement and the scope of activity, geographic, and temporal restrictions within the Agreement are reasonable (Dkt. #20 at pp. 23–32). In response, Phillips argues that the Agreement is unenforceable because the non-compete provisions are unreasonable, particularly in terms of the scope of activity, geographic and temporal restrictions (Dkt. #23 at pp. 23 32).

Under Texas law, a covenant not to compete is enforceable when (1) it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made and (2) it contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and does not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee. TEX. BUS. & COM. CODE § 15.50(a). "'A restrictive covenant is unreasonable unless it bears some relation to the activities of the employee.'" *Jordan Khan Music Co., LLC v. Taglioli*, 620 F. Supp. 3d 544, 549 (E.D. Tex. 2022) (quoting *Wright v. Sport Supply Grp, Inc.*, 137 S.W.3d 289, 298 (Tex. App.–Beaumont 2004, no pet.). "The enforceability of a

covenant not to compete is a question of law for the court." *Vais Arms, Inc. v. Vais*, 383 F.3d 287, 295 (5th Cir. 2004) (quoting *Butler v. Arrow Mirror & Glass, Inc.*, 51 S.W.3d 787, 792 (Tex. App.— Houston [1st Dist.] 2001, no pet.)).

First United and Spend Life claim that the Agreement is ancillary to an otherwise enforceable agreement—the Stock Purchase Agreement (Dkt. #20 at p. 25). Phillips does not dispute that the Agreement is ancillary to an otherwise enforceable agreement (Dkt. #23 at p. 22 n.1). Therefore, the Court finds that the Agreement is ancillary to the Stock Purchase Agreement, an otherwise enforceable agreement.

### 1.    Scope of Activity

The scope of activity restraint in the Agreement is that Phillips shall "not [] (either personally or by or through his agent), directly or indirectly, with or without compensation, engage in, be employed by or have any interest in . . . any Prohibited Business . . ." (Dkt. #19, Exhibit 2 at p. 3). "'Prohibited Business' shall mean any company or other entity engaged in business of originating mortgage loans as well as the purchase and sale of mortgage loans through the secondary mortgage market, including any Affiliate thereof, or any federally insured depository institution, including an Affiliate thereof'" (Dkt. #19, Exhibit 2 at p. 3). "'Affiliate shall mean any individual, corporation, partnership, limited liability company or other entity (each a 'Person') that directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with a referenced Person'" (Dkt. #19, Exhibit 2 at p. 3).

Plaintiffs argue that the Court should find the scope of activity restraint to be reasonable based on the decision of another court in the Sherman division, *Providence Title Co. v. Truly Title, Inc.* (Dkt. #20 at pp. 30–32). First, Plaintiffs note that in *Providence Title Co.*, the court barred a

"former executive level employee, shareholder and board member from working for a competitor in any capacity" (Dkt. #20 at p. 30). 547 F. Supp. 3d at 600. Then, Plaintiffs claim that Phillips possessed a similarly high-level position at First United to the former employee in *Providence Title Co.*, such that Phillips was engaged in every aspect of First United's business (Dkt. #20 at p. 31). Therefore, Plaintiffs assert that the Court should find the scope of activity limitation in the Agreement to be reasonable (Dkt. #20 at pp. 31–32).

In response, Phillips argues that the Court should find the scope of activity restraint to be overly broad and unreasonable based on *Forum US, Inc. v. Musselwhite* (Dkt. #23 at pp. 25–26). No. 14-17-00708-CV, 2020 WL 4331442 (Tex. App.—Houston [14th Dist.] July 28, 2020, no pet.). In *Forum US, Inc.*, the court found that a non-compete agreement prohibiting a former sales manager from providing services to or otherwise affiliating with a competitor of his former employer was an unreasonable restraint on the scope of the former employee's activity. 2020 WL 4331442, at *7–8. These limitations were overbroad and unreasonable because the agreement prohibited the former employee "from engaging in activities for another entity that potentially had no connection with his activities while an employee of [his former employer]." *Id.* at *8. Phillips argues that the Agreement's scope of activity restraint similarly prohibits Phillips from engaging in activities for another business that potentially have no connection with his activities performed while an employee of First United (Dkt. #23 at pp. 25–26).

Phillips further argues that the Agreement's scope of activity restraint is unreasonable because its prohibition on activities "whether compensated or uncompensated" is broader than necessary to protect First United's legitimate business interests (Dkt. #23 at p. 26). Next, he argues that definition of "Prohibited Business" is overly broad (Dkt. #23 at pp. 26–27). Finally,

Phillips asserts that the Court should not rely on *Providence Title Co.* because the agreement in *Providence Title Co.* (1). "limits restricted businesses to those entities 'in competition with or otherwise similar to Providence's business,' qualifiers that are much narrower than present in the Agreement;" (2) "does not expressly prohibit uncompensated work or affiliation;" (3) "does not prohibit work for 'affiliates' of competing businesses;" (4) contains narrower geographic and temporal scopes (Dkt. #23 at p. 28).[3]

In the case of former executive level employee and shareholder, where the former employee was involved with all aspects of the former employer's business, a scope of activity restraint in a non-compete agreement may broadly prohibit any affiliation with a competitor business, where the non-compete agreement also contains reasonable restricted temporal and geographic scopes. *See Providence Title Co.*, 547 F. Supp. 3d at 603. In *Providence Title Co.*, a non-compete provision prohibited a former executive level employee and shareholder in a title insurance company from "affiliate[ing] with any business in competition or otherwise similar to [her former employer's] business . . . ." *Id.* at 599. The court noted that "[a] limitation on the scope of activity to be restrained is reasonable if it bears some relation to the work of the employee." *Id.* at 603. As the former President and a member of the Board of Directors of her former employer, the former employee "was involved in all aspects of [her former employer's] business." *Id.* "Thus, any affiliation with the business of another title company relates to her work at [her former employer's business]." *Id.* Therefore, the court decided that the scope of activity restraint was reasonable. *Id.*

---

[3] Phillips additionally distinguishes *Providence Title Co.* from this case because *Providence Title Co.* analyzed a restrictive covenant in the context of a preliminary injunction, while this case deals with a motion for summary judgment seeking damages (Dkt. #23 at p. 28). However, the Court does not view this distinction as significant because the substantive law the Court must apply in analyzing the Agreement is the same in both the summary judgment and preliminary injunction contexts. *See Janvey v. Alguire,* 647 F.3d 585, 596 (5th Cir. 2011) (quoting *Roho, Inc. v. Marquis,* 902 F.2d 356, 358 (5th Cir.1990)) ("To assess the likelihood of success on the merits, [courts] look to 'standards provided by the substantive law.'").

Importantly, the court noted that the scope of activity restraint did not amount to an industry-wide exclusion because of the non-compete provision's geographic limitations. *Id.*

The scope of activity restraint in the Agreement is reasonable because of activities Phillips engaged in as the President, a shareholder, and a member of the Board of Directors at First United. (Dkt. #20, Exhibit 1 ¶¶ 6–7, 9). As the most senior executive officer of First United, Phillips "was responsible for (among other things) the banking operations at each of First United's banking locations in Oklahoma and Texas" (Dkt. #20, Exhibit 1 ¶¶ 6–7). Based on this information, Phillips appears to have been involved in all aspects of First United's business. *See Providence Title Co.*, 547 F. Supp. 3d at 603. Thus, any affiliation with the business of another bank relates to his work at First United. *Id.* Therefore, the activities to be restrained bear some relation to the activities of Phillips's former roles at First United.

Despite Phillips's arguments, the principles of *Providence Title Co.* are applicable to this case because of the strong factual similarity in the two cases. In both cases, the former employee at issue was the President, a shareholder, and a member of the Board of Directors of their respective former employers (Dkt. #20, Exhibit 1 ¶¶ 6–7, 9). *Providence Title Co.*, 547 F. Supp. 3d at 593, 602. Phillips's first, second, and third arguments to distinguish *Providence Title Co.* from this case are insignificant because a scope of activity restraint may broadly prohibit any affiliation with a competitor business in the circumstances of this case (assuming reasonable geographic and temporal limitations exist). *See id.* at 603. This same principle enables the scope of activity restraint to remain reasonable despite the broad definition of "Prohibited Business" and the restraint on certain activities "whether compensated or uncompensated." *See id.* Regarding Phillips's fourth claimed distinction, the Court analyzes the geographic and temporal limitations separately. *See*

*infra* Parts III.B.2 & III.B.3. However, the presence of reasonable geographic and temporal limitations prevent the scope of activity restraint from amounting to a industry-wide exclusion. *See id.*; *see also Providence Title Co.*, 547 F. Supp. 3d at 593, 603. Further, *Forum US, Inc.* is distinct from this case because the former employee in that case was sales manager, working within a much narrower set of his former employer's overall activities, while Phillips was the President, a shareholder, and a member of the Board of Directors of First United (Dkt. #20, Exhibit 1 ¶¶6–7, 9). 2020 WL 4331442, at *1.

Although the parties fiercely dispute whether (and the extent of) First United and UTB are competitors, UTB exists within the banking industry and is a federally insured depository institutions (Dkt. #23 at p. 27; Dkt. #23, Exhibit 1 at ¶ 9). Further information is not necessary to determine the validity of the scope of activity restraint within the Agreement.

For the reasons discussed above, the Court finds that scope of activity restraint within the Agreement is reasonable.

## 2. Geographic Scope

The restricted geographic scope in the Agreement covers "any Prohibited Business . . . having an office located, or any employees principally doing business, within 100 miles of any office of the [First United]" (Dkt. 19, Exhibit 2 at p. 3).

Plaintiffs argue that "[g]iven Phillips' position and day-to-day involvement in First United's entire operations, including the operations of the individual First United banking locations and the fact that most of First United's customers are located in a market area of 100 miles from each First United location, the geographic scope of the 'Non-Compete' provisions is reasonable" (Dkt. #20 at p. 29). Plaintiffs claim that "First United has simply tried to protect the

geographic areas in which it operates from unfair competition by its former President" (Dkt. #20 at p. 30)

Phillips presents two arguments that the restricted geographic scope of the non-compete provisions is unenforceable. First, Phillips argues that the phrase "employees principally doing business" is vague and impossible to define, such that the Agreement is unenforceable (Dkt. #23 at p. 30). Phillips claim the facts of this case mirror *Gomez v. Zamora*, which demonstrates the Agreement fails to specify the restricted geographic scope of the Agreement (Dkt. #23 at p. 31). 814 S.W.2d 114 (Tex. App.—Corpus Christi 1991, writ denied). Second, Phillips argues that the restricted geographic scope is overly broad because it is not limited to locations where Phillips actually worked for First United (Dkt. #23 at p. 31).

### a. The Phrase "Employees Principally Doing Business"

Unlike the situation in *Gomez*, the phrase "employees principally doing business" does not prevent the Agreement from specifying its restricted geographic scope. In *Gomez*, a non-solicitation covenant prohibited a former employee from soliciting clients in "an existing marketing area" and a "future marketing area of the employer begun during employment." *Gomez*, 814 S.W.2d at 117–18. The court determined that no reasonable geographic limitation existed because "the record does not reflect the geographic area intended to be covered by the covenant . . . [and] the covenant as written fails to accurately specify the geographic scope covered by covenant." *Id.* at 118. In this case, the bounds of the geographic area intended to be covered by the Agreement are clear, a radius of 100 miles around each office of First United (Dkt. 19, Exhibit 2 at p. 3; Dkt. #20, Exhibit 3).

Further, the meaning of the phrase "employees principally doing business" is not vague and impossible to define. However, neither party attempts to define the phrase. "To determine the common, ordinary meaning of undefined terms used in contracts, statutes, and other legal documents, '[courts] typically look first to their dictionary definitions and then consider the term's usage in other statutes, court decisions, and similar authorities.'" *Pharr–San Juan–Alamo Indep. Sch. Dist. v. Tex. Pol. Subdivisions Prop./Cas. Joint Self Ins. Fund*, 642 S.W.3d 466, 474 (Tex. 2022). "The test is what the text reasonably meant to an ordinary speaker of the language who would have understood the original text in its context." *Van Dyke v. Navigator Grp.*, 668 S.W.3d 353, 360 (Tex. 2023). The Court must consider the phrase within the larger context of the surrounding sentence and paragraph (" . . . any Prohibited Business . . . having an office located or employees principally doing business, within 100 miles of any office of the Bank . . . "), which indicates the phrase refers to a location and the employees of a "Prohibited Business" (*See* Dkt. #19, Exhibit 2 at p. 3). "Principally" means "chiefly" or "mainly." *Principally*, DICTIONARY.COM, https://www.dictionary.com/browse/principally (last visited Oct. 17, 2023). "Business" means "a usually commercial or mercantile activity engaged in as a means of livelihood." *Business*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/business (last visited Oct. 17, 2023). The context of the phrase further indicates that "business" refers to the business of a "Prohibited Business" (*See* Dkt. #19, Exhibit 2 at p. 3). Therefore, the phrase "employees principally doing business" within the context of the contractual provision refers to "the location at which employees of a Prohibited Business chiefly or mainly engage in commercial or mercantile activity of the Prohibited Business as a means of livelihood" (*See* Dkt. #19, Exhibit 2 at p. 3).

### b.  Locations Where Phillips Actually Worked

"The permissible breadth of the geographic applicability of a noncompete provision depends both on the nature of the business and the degree of the employee's involvement in the business." *Providence Title Co.*, 547 F. Supp. 3d at 602 (citing *AmeriPath, Inc. v. Hebert*, 447 S.W.3d 319, 335 (Tex. App.—Dallas 2014, pet. denied)). "This often means that a noncompete provision should apply only in the locale where the employee worked." *Id.* (citing *Ameripath, Inc.* 447 S.W.3d at 335). "However, when an employee is involved in the higher levels of company management, greater geographic restrictions are often justified because the employee's knowledge of and experience with the company extend beyond the location where she worked." *Id.* (citing *Ameripath, Inc.*, 447 S.W.3d at 335). In *Providence Title Co.*, the court found the restricted geographic scope in the non-compete of a former employee that extended beyond where she had actually worked was reasonable because she had been President, a shareholder, and member of the Board of Directors of her former employer. *Id.* at 602. As a result of her positions "in the highest levels of the company, [she] was privy to confidential information and heavily involved in decision making related to the company at large, which operates throughout the State of Texas." *Id.* The court further found that the restriction was reasonable because "[the former employee's] intimate knowledge of and experience with [her former employer's] business, including its confidential information, would make her a valuable asset to a competitor anywhere [her former employer] operates." *Id.* at 602–03.

The restricted geographic scope of the Agreement is reasonable due to Phillips's former roles of President, shareholder, and member of the Board of Directors of First United (Dkt. #20, Exhibit 1 ¶¶ 6–7, 9). While working at First United, Phillips primarily worked in McKinney, Texas

(Dkt. #23, Exhibit 1 ¶ 3). In these positions, Phillips "communicated with First United's customers and was exposed to trade secrets and other confidential and proprietary information relating to First United's customers, employees, suppliers, and business methods and practices" (Dkt. #20, Exhibit 1 ¶ 8). Further, Phillips was likely heavily involved in decision making related to First United at large through his positions (*See* Dkt. #20, Exhibit 1 ¶¶ 6–7, 9). Therefore, the restricted geographic scope extending beyond where Phillips actually worked is reasonable because his intimate knowledge of and experience with First United's business, including its confidential information, would make him a valuable asset to a competitor anywhere First United operates. *Providence Title Co.*, 547 F. Supp. 3d at 602–03.

The 100-mile radius around each of First United's office locations in the restricted geographic scope is a reasonable geographic restraint to protect First United's economic interests. In *SBPS, Inc. v. Mobley*, the Court held that a restricted geographic scope was reasonable where the non-compete provision prohibited a former national sales director from competing with his former employer within a 250-mile radius from the various cities where its officers and customers were located. No. 4:18-CV-00391, 2018 WL 4185522, at *13 (E.D. Tex. Aug. 31, 2018). The Court found the restricted geographic scope to be reasonable because the former employee "[drove] overall new business development growth in existing as well as new markets." *Id.* Akin to *SBPS, Inc.*, Phillips's intimate knowledge of and experience with First United's business justifies the restriction of a 100-mile radius around each of First United office locations, where a majority of First United's customers live (*See* Dkt. #20, Exhibit 1 ¶¶ 5–7, 9). *See SBPS, Inc.*, 2018 WL 4185522, at *13; *Providence Title Co.*, 547 F. Supp. 3d at 602–03.

For the reasons discussed above, the Court finds that the restricted geographic scope within the Agreement is reasonable.

### 3.    Temporal Scope

The restricted temporal scope of the non-compete provisions depends on whether Phillips remained an employee of First United after April 30, 2021.[4] If Phillips remained an employee of First United after April 30, 2021, then the restricted temporal scope would be thirty days after he stopped serving as an executive officer (*See* Dkt. #19, Exhibit 2 at p. 3). If Phillips did not remain an employee of First United after April 30, 2021, then the restricted temporal scope would be the three-year period following that date (*See* Dkt. #19, Exhibit 2 at p. 3). The three-year temporal restriction would apply because Phillips signed the Agreement on July 1, 2017, greater than 24 months before April 30, 2021 (*See* Dkt. #20, Exhibit 1 ¶ 9).

No dispute exists between the parties that a thirty-day restricted temporal scope is reasonable (Dkt. #20; Dkt. #23). Therefore, the Court finds that a thirty-day restricted temporal scope is reasonable.

Plaintiffs argue that a three-year restricted temporal scope is reasonable because courts in Texas routinely find that non-compete periods of between two and five years are reasonable (Dkt. #20 at pp. 26–27). Further, Plaintiffs claim that a three-year restricted temporal scope is

---

[4] The Agreement provides

> The term "Non-Competition Period" shall mean the period commencing on the date of this Agreement and ending on the earlier of: . . . (iii) the third anniversary following the Undersigned's Separation Date, in the event the Separation Date occurs at any time following twenty four (24) months after the date of this Agreement; (iv) thirty (30) days following the date on which the Undersigned is no longer serving as an executive officer of the Company or the Bank, and remains employed by the Company or the Bank.

(Dkt. #19, Exhibit 2 at p. 3).

reasonable to prohibit the disclosure or use of Phillips's highly confidential information by Phillips or a competitor of First United (Dkt. #20 at p. 27).

In response, Phillips argues that courts generally only uphold temporal restrictions of (greater than two years and) up to five years "(a) in connection with a sale of business or (b) justified by evidence of amount of time it takes for a company's confidential information to go stale" (Dkt. #23 at p. 29). Phillips claims that First United has not provided any evidence supporting the reasonableness of a three-year restricted temporal scope (Dkt. #23 at p. 30). Instead, Phillips asserts that the three-year restricted temporal scope is unreasonable because any confidential information that Phillips had would have become stale because "the banking industry is a fast-paced, dynamic industry" (Dkt. #23 at p. 30).

In reply, Plaintiffs claim that a three-year restricted temporal scope is reasonable "to prevent Phillips . . . from using First United's confidential and proprietary banking information for the benefit of First United's competitors" (Dkt. #26 at p. 10). Plaintiffs further assert that "[t]he confidential and proprietary information Phillips received (and otherwise had unfettered access to) while serving in the highest levels of First United management does not go stale overnight" (Dkt. #26 at p. 10).

Texas courts routinely find that a two-to-five-year time restriction is reasonable in non-compete agreements. *Salas v. Chris Christensen Sys., Inc.*, No. 10–11–00107–CV, 2011 WL 4089999, at *19 (Tex. App.—Waco Sept. 14, 2011, no pet.) (citing *Gallagher Healthcare Ins. Servs. v. Vogelsang*, 312 S.W.3d 640, 655 (Tex. App.—Houston [1st Dist.] 2009, pet. denied)); *Arevalo v. Velvet Door, Inc.*, 508 S.W.2d 184, 186 (Tex. App.—El Paso 1974, writ ref'd n.r.e.); *Elec. Data Sys. Corp. v. Powell*, 508 S.W.2d 137, 139 (Tex. App.—Dallas 1974, writ ref'd n.r.e.); *Weber v. Hesse*

*Envelope Co.*, 342 S.W.2d 652, 656 (Tex. App.—Dallas 1960, no writ); *Chandler v. Mastercraft Dental Corp.*, 739 S.W.2d 460, 464 (Tex. App.—Fort Worth 1987, writ denied); *RealPage, Inc. v. Enter. Risk Control, LLC*, No. 4:16-CV-00737, 2017 WL 3313729, at *6–7 (E.D. Tex. Aug. 3, 2017). Based on this information, the Court finds that a three-year restricted temporal scope is reasonable.

The Court finds that the non-compete provisions within the Agreement are enforceable. Plaintiffs have conclusively proven that the Agreement was ancillary to an otherwise enforceable agreement at the time the Agreement was made and contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the business interests of First United. Further, the scope of activity restraint in the Agreement does not amount to an industry-wide ban because reasonable restricted temporal and geographic scopes are present. *See Providence Title Co.*, 547 F. Supp. 3d at 603. Therefore, the Court grants summary judgment in favor of Plaintiffs as to the validity of the Agreement.

### C.  First United and Spend Life's Damages

After a careful review of the record and arguments presented, the Court is not convinced that Plaintiffs met their burden of demonstrating that no genuine issue of material fact exists regarding First United and Spend Life's damages under their claims. Accordingly, the Court finds that Plaintiffs' Motion for Summary Judgment Against Defendant's Counterclaims (Dkt. #18) should be denied regarding First United and Spend Life's damages under their claims.

### IV.    Phillips's Motion for Summary Judgment

The Court will not consider the merits of Defendant's Cross Motion for Summary Judgment (Dkt. #23) because the Court granted Plaintiffs' Amended Motion to Strike Defendant's Cross Motion for Summary Judgment (Dkt. #28).

## CONCLUSION

It is therefore **ORDERED** that Plaintiffs' Motion for Summary Judgment Against Defendant's Counterclaims (Dkt. #18) is hereby **GRANTED in part and DENIED in part.** The Court grants summary judgment in favor of Plaintiffs only regarding Phillips's defamation and libel counterclaim to the extent it relies on the second and third sentences of the third paragraph in the June 7, 2022 letter and Phillips's breach of contract counterclaim. The Court does not grant summary judgment in favor of Plaintiffs regarding Phillips's defamation and libel counterclaim to the extent it relies on the first sentence of the third paragraph in the June 7, 2022 letter.

It is therefore **ORDERED** that Plaintiffs' Motion for Summary Judgment on Each of Its Claims Against Defendant (Dkt. #20) is hereby **GRANTED in part and DENIED in part.** The Court grants summary judgment in favor of Plaintiffs under this motion only to the extent that the Agreement constitutes a valid contract. The Court does not make any finding as to the temporal extent of Phillips's obligations under the non-compete provisions because that issue depends on the outcome of a genuine issue of material fact.

It is therefore **ORDERED** that Defendant's Cross Motion for Summary Judgment (#23) is hereby **DENIED.**

It is therefore **ORDERED** that Plaintiffs' Amended Motion to Strike Defendant's Cross Motion for Summary Judgment (Dkt. #28) is hereby **GRANTED** and Defendant's Cross Motion for Summary Judgment (#23) is hereby **STRICKEN.**

**IT IS SO ORDERED.**
**SIGNED this 31st day of October, 2023.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE

33